## HALL–SCOTT MOTOR CAR CO. v. UNIVERSAL INS. CO.

### No. 9769.

Circuit Court of Appeals, Ninth Circuit.

Aug. 20, 1941.

Rehearing Denied Sept. 22, 1941.

Writ of Certiorari Denied Dec. 8, 1941.

See —— U.S. ——, 62 S.Ct. 360, 86 L.Ed. ——.

Graham & Morse, of San Francisco, Cal., for appellant.

George H. Hauerken, of San Francisco, Cal., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought in the United States District Court for the Northern District of California to recover damages resulting from the almost total destruction by fire of the gasoline power cruiser "Pacifica", while in the custody of the Hall-Scott Motor Car Company, hereinafter called the "Motor Car Company". Jurisdiction is predicated upon diversity of citizenship. The case was tried to the court without a jury, by stipulation. Judgment was for the plaintiff for the sum of $3,200. The court found that the fire resulted from the negligence of the Motor Car Company. The Motor Car Company appeals.

The Pacifica had been sold by R. J. Hooper and Mrs. Clyde Hooper to R. Jack Hofmann by conditional sales contract. Hofmann wished to replace the gasoline motor in the yacht with a reconditioned "Invader" engine belonging to the Hall-Scott Motor Car Company. The Pacifica was delivered to the Motor Car Company for that purpose in December, 1939.

A written contract of sale of motor No. 25,509, called a conditional sales contract, was entered into between the buyer and seller on January 4, 1940, wherein it was agreed that the Motor Car Company should install the motor in the Pacifica.

Manuel Marks, an employee of the Motor Car Company, was working on the vessel on January 5, 1940, to prepare it for the installation of the motor when an explosion and fire occurred which resulted in the almost total destruction of the Pacifica and the death of the employee.

The owners of the vessel were insured against loss by fire with the Universal Insurance Company, hereinafter called the "Insurance Company", the appellee. This company paid Hofmann the fire loss of $3,200 on January 19, 1940, and under the terms of the insurance contract was thereupon subrogated to any rights and remedies which the owner might have to recover for such damage from any third person.

The Insurance Company brought this suit against the Motor Car Company as subrogee of the insured. The complaint contained two counts, the first alleging a delivery of the boat by the owner to the Motor Car Company in December, 1939, for the purpose of installing an engine for an agreed consideration. It alleged the total loss of the vessel by fire and the consequent failure to redeliver said vessel.

The second count of the complaint reiterated the facts alleged in the first count and alleged further that the Pacifica was destroyed by fire on January 5, 1940, because of the negligence of the Motor Car Company and its employees.

The answer of the Motor Car Company admitted and alleged the delivery to it of the motor vessel Pacifica at its boat house at the foot of Chestnut Street, Alameda, on the Oakland Estuary, in the County of Alameda, State of California for the purpose of the installation of the reconditioned motor under the conditional sales agreement dated January 4, 1940. The answer alleges that said conditional sales agreement provided as follows: "It is understood further Hall Scott will not be held responsible for any damage to cruiser 'Pacifica' or for anything taken from same while the engine installation is being made."

It is further alleged that R. J. Hooper who sold the Pacifica to R. Jack Hofmann under the conditional sales contract consented to the installation by the following agreement: "I agree to allow your company to install your reconditioned Invader in the Pacifica under terms specified in your conditional sales agreement January 4, 1940."

The answer also denied negligence on the part of the defendant.

At the time of the trial most of the facts were stipulated. It was also agreed that the remaining issues were:

"No. 1, the value of the vessel in a sound condition as of January 5, 1940, shortly prior to the fire on that day." On this issue the court found the value to be $3,200, without the engine which had been removed.

"No. 2, whether or not the damage to the boat on that day was caused by the negligence of the employees of the defendant under the second cause of action, or whether the defendant has failed in his contract of bailment under the first cause of action, to redeliver the boat in good order and condition, and the amount of damage, * * *".

The copy of the conditional sales contract of January 4, 1940, attached to the defendant's answer was stipulated to be correct. This contract contained the provision above set out relied upon by the defendant to exculpate it from the claim for damages.

It was stipulated that Hofmann purchased a boat called the "Flyer" and on March 12, 1940, entered into a contract with the Motor Car Company to install an Invader engine therein; that when they entered into the new contract they also entered into a written agreement as follows:

"In consideration of the execution by the Hall-Scott Motor Car Company and R. J. Hofmann of conditional sales agreement for the installation of Invader engine No. 25,508 on the boat Flyer, it is mutually agreed by the parties that the conditional sales agreement heretofore executed on the 4th day of January, 1940, by R. J. Hofmann is rescinded."

The Motor Car Company on this appeal contends that under the above quoted provision of the contract of January 4, 1940, exculpating it from damage to the Pacifica, it is not liable for the damages resulting from the fire even if it were negligent in causing the fire.

On the other hand the Insurance Company contends that the above mentioned agreement of March 12, 1940, which "rescinded the agreement of January 4, 1940" rescinded the agreement with reference to damages and, consequently, that the case must be decided without reference to that provision of the contract of January 4, 1940. The Insurance Company also contends that even if this provision of the contract was still effective the agreement with relation to damages does not exculpate the Motor Car Company for the reason that it was a bailee for hire and that such a bailee cannot relieve itself from the results of its own negligence by such a contract. The Motor Car Company contends that regardless of the rule which may obtain in California where the contract of January 4, 1940, was executed, concerning the responsibility of bailees for hire, the contract in question was a maritime contract and controlled by the principles of admiralty law instead of by the local law of the state. It is clear that under the law of

California a bailee for hire cannot exculpate himself from his own negligence by contract. Dieterle v. Bekin, 143 Cal. 683, 77 P. 664.

While this action is on the law side of the court the rights of the parties are the same as though it was brought in admiralty. Chelantis v. Luckenbach S. S. Co., 247 U.S. 372, 384, 38 S.Ct. 501, 62 L.Ed. 1171; Union Fish Co. v. Erickson, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261; Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 159, 161, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145. In Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 259, 42 S.Ct. 475, 477, 66 L.Ed. 927, the court said: "The general rules of the maritime law apply whether the proceeding be instituted in an admiralty or common-law court." This rule was recognized by this court in Puget Sound Navigation Co. v. Nelson, 9 Cir., 41 F.2d 356, 357, Id., 9 Cir., 59 F.2d 697. That was an action at law brought to recover damages for loss of property resulting from a collision on the inland waters of Puget Sound. This court, speaking through Judge Rudkin, said: "While this action was tried on the common-law side of the court, the rights and liabilities of the parties are measured by the admiralty law, and not by common-law standards." This view was reiterated on second appeal, Id., 9 Cir., 59 F.2d 697. We will therefore first consider the question as to whether the contract of January 4, 1940, is a maritime contract.

It provided for the purchase of an engine and its installation in a boat which had long been in use upon navigable waters. A contract for repair of such a vessel is held to be a maritime contract. The V-14813, 5 Cir., 65 F.2d 789.

It is clear that this was a maritime contract.

Can the parties to a maritime contract to repair a vessel validly stipulate that the repairer may be freed from the consequences of his negligent damage to the vessel in his custody for repairs?

The appellant relies upon the case of Newport News Shipbuilding & Dry Dock Co. v. United States, 4 Cir.; 34 F.2d 100 and International M. M. S. S. Co. v. W. & A. Fletcher Co., 2 Cir., 296 F. 855, to support its claim that the exculpatory provision is valid. In the Newport News case the Circuit Court of Appeals for the Fourth Circuit considered the effect of an agreement on the part of the United States to maintain insurance contained in a contract for the repair of one of its vessels. The majority of the court held that under the agreement the shipyard was exempted from the loss due to its negligence in causing fire while the ship was undergoing repair to the extent of the agreement of the government to maintain fire insurance. Judge Parker dissented but all agreed that a contract could be made relieving the shipyard from liability for its negligence. Judge Parker in dissenting said [34 F.2d 109]: "While, of course, it is permissible to contract against liability for negligence, no contract ought to be construed to have that effect unless such intention clearly appears." Citing, McCormick v. Shippy, 2 Cir., 124 F. 48, 51, International M. M. S. S. Co. v. W. & A. Fletcher Co., 2 Cir., 296 F. 855. The majority said: "We agree with the judge below when he said: 'There can be no doubt, I think, that a contract whereby the United States agreed to assume all liability for damage to its vessel while at the yard would be valid.'" Citing, Santa Fe Ry. Co. v. Grant Bros. Co., 228 U.S. 177, 33 S. Ct. 474, 57 L.Ed. 787.

As this decision of the Fourth Circuit Court of Appeals is the only decision cited to us or found by us after a diligent search dealing with the question under consideration, we will consider the authorities cited by the court as supporting its conclusion.

International M. M. S. S. Co. v. W. & A. Fletcher Co., supra, deals with a contract for the repair of a vessel. The action was in admiralty and it was held that the shipyard was bailee. The damage was by fire. The question involved was whether the parties had contracted that the price quoted for the repair work did not cover any risk which could be covered by insurance. The Circuit Court of Appeals for the Second Circuit assumed, without deciding, that a contract giving the shipyard the benefit of the shipowners marine insurance would be valid but decided that no such contract was entered into. The other cases cited by the Circuit Court of Appeals for the Fourth Circuit in support of the assumption, Santa Fe Ry. Co. v. Grant Bros. Co., 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787, and McCormick v. Shippy, 2 Cir., 124 F. 48, 49, do not decide the question.

McCormick v. Shippy, supra, dealt with a contract between an owner and charterer of a pleasure yacht. It was held that the provision that the "charterer shall assume

no responsibility for loss or damage to the yacht" was valid and not in conflict with public policy. The court said: "The clause must be interpreted to include loss through his negligence, because for loss not arising from negligence he would not be liable." Because, as the court said: "The charterer of a vessel is a bailee for hire, and 'is only responsible for ordinary diligence and is liable for ordinary negligence in the care of the property bailed.'"

The case of Santa Fe Railway Co. v. Grant Bros. Co., supra, upholds a provision exculpating the Railway Company from its negligence, causing the death of an employee of a contractor who was being carried by the Railway Company under a private agreement of carriage incidental to the work of the contractor for the Railway Company.

It thus appears that the authorities cited by the Circuit Court of Appeals for the Fourth Circuit in support of its conclusion in the Newport News case do so only by assuming the analogy of the case of charterer and of a private carrier to a bailment of a vessel for repairs.

In default of other decisions both parties cite and rely upon analogous cases among others those relative to the towage of vessels. The decisions on the right of a towing vessel to contract exempting itself from negligence resulting in damage to, or loss of, the tow, are in direct conflict.

### Towage Contracts.

This court has held that a contract relieving a towing vessel from the results of its negligence is void and has based its decisions upon the decision of the Supreme Court in 1870, in the case of The Steamer Syracuse, 12 Wall. 167, 79 U.S. 167, 20 L. Ed. 382. In Alaska Commercial Co. v. Williams, 9 Cir., 128 F. 362, decided in 1904, we held, as stated in the syllabus: "A towing vessel cannot relieve itself by contract from liability for the failure to exercise reasonable care and skill in the performance of the service and for the safety of the tow."

This court, in Mylroie v. British Columbia, etc., 9 Cir., 1920, 268 F. 449, and in Sacramento Nav. Co. v. Salz, 9 Cir., 3 F.2d 759, 761, adhered to the view expressed in our earlier decision, Alaska Commercial Co. v. Williams, 9 Cir., 128 F. 362, supra.

On the other hand the Circuit Court of Appeals for the Second Circuit has consistently held such contracts valid. The Cutchoque, 2 Cir., 10 F.2d 671.

The Court of Appeals of the State of New York, Graves v. Davis, March 23, 1923, 235 N.Y. 315, 139 N.E. 280, 281, held that such a contract limiting the liability of the tug was valid. The court said: "A tug is not a common carrier of the tow. The owners of a tug may restrict their liability by special agreement. No rule of public policy is involved."

The District Court of the Eastern District of New York in 1938, The Melvin and Mary, 23 F.Supp. 398, 400, held an agreement exempting the tugboat from liability was valid. "Such an agreement has been upheld and found to be binding upon the parties making the same." Two decisions by the District Court for the Eastern District of New York are cited in support of this conclusion; The Primrose, 1933, 3 F. Supp. 267; and The John J. Feeney, 3 F. Supp. 270.

In The Primrose, supra, it was held that the owner of the tug could exempt itself from liability for his own negligence and did so by the following phrase in the contract: "It is agreed that all risks of damage, loss, or expense to the barges named herein, howsoever caused, occurring during the currency of this agreement shall be assumed by the party of the second part." [3 F.Supp. 268.] The judge said that the law had been so firmly established in the Second Circuit that the Navegacion case, Compania de Navegacion v. Phoenix Ins. Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, should not be held to change the rule.

In the Feeney case, supra, decided by the same judge the same day, (3 F.Supp. 270) a contract providing that the barge owners assumed all risk of damage, loss and expense, was held to be a waiver of any claim for damages for negligence.

The Supreme Court has unquestionably settled this difference in Compania de Navegacion v. Phoenix Ins. Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, where, as stated in the syllabus, it was held that "a clause in a towage contract declaring that the towing boat shall not be responsible in any way for loss or damage to the tow, does not release the former from loss or damage due to the negligence of her master or crew."

If these decisions of the Supreme Court and of this court are applicable to a mari-

time contract to repair a ship it is clear that such a contract to exculpate the contractor for his negligence is invalid. But there are other decisions involving contracts exculpating a party from the results of his negligence which are cited as analogous and, consequently, as bearing upon the question.

In Sun Oil Co. v. Dalzell Co., 1932, 287 U.S. 291, 53 S.Ct. 135, 136, 77 L.Ed. 311, the question involved had to do with a contract of towage wherein it was provided that where the towed vessel uses her own propelling power and the captain of the towing tugboat went aboard the tow to pilot it, he then became the servant of the owners of the tow, consequently, the owners of the tugboat were not liable for damages resulting from his negligence. The court held this provision valid. It is said "so far as concerns the service to be rendered under the agreement, respondent was not a common carrier or bailee or bound to serve or liable as such. Towage does not involve bailment, and the services covered by the contract were less than towage. * * *

"There is no foundation in this case for the application of the doctrine that common carriers and others under like duty to serve the public according to their capacity and the terms of their undertaking cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence. New York C. Railroad Co. v. Lockwood, 17 Wall. 357, 21 L.Ed. 627; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 440, 9 S.Ct. 469, 32 L.Ed. 788." It is stated by the court that its holding was in no wise in conflict with the Syracuse case, supra, or the Navegacion case, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, supra, because "neither involved an agreement similar to the provisions of the pilotage clause on which this case turns."

The Supreme Court, in a number of cases in which the parties did not occupy the relation of bailee or common carrier, has upheld the validity of contracts between the parties exculpating one of them from the results of his negligence. Accordingly, in Santa Fe, etc., Ry. v. Grant Bros. Co., 1913, 228 U.S. 177, 33 S.Ct. 474, 477, 57 L. Ed. 787, supra, it upheld the validity of such a contract. While the court reaffirmed the doctrine that a common carrier cannot secure immunity from liability for its negligence by any sort of a stipulation it said that "the rule extends no further than the reason for it. It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation."

A similar conclusion was reached in Baltimore & Ohio, etc., Ry. Co. v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 387, 44 L.Ed. 560, in relation to the right of the Railroad Company to thus protect itself from claims for damages resulting from injuries negligently inflicted upon an employee of an express company who was being transported in the performance of his duty under contract between the Railway Company and the Express Company which exempted the company from claims for damages from injuries negligently inflicted upon such employees. The employee had also stipulated with the Express Company that he assume the risks of all expense and injuries which he might sustain in the course of his employment whether occasioned by negligence or otherwise. The court, after referring to the cases previously decided by it denying the right of a common carrier to make such a contract with relation to persons or property transported in such capacity, said:

"The principles declared in those cases are salutary, and we have no disposition to depart from them. At the same time it must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare."

The same ruling was made by the Supreme Court in a case involving injuries to the employees of the Pullman Company being transported in pursuance of their duty and special contract between the Railway Company and the Pullman Company. Robinson v. Baltimore & Ohio R. R. Co., 237 U.S. 84, 35 S.Ct. 491, 492, 59 L. Ed. 849. The court said: "It is also clear that, unless condemned by statute, the contract was a valid one and a bar to re-

covery." Citing, Baltimore & O. Ry. v. Voigt, supra, Sante Fe, etc., Ry. v. Grant Bros. Co., supra.

It was held that as the Pullman porter who was injured was not in the employ of the Railway Company and, consequently, not affected by § 5 of the Employers' Liability Act, § 5, ch. 149, 35 Stat. 65, 45 U.S. C.A. § 55, that the contract between the Pullman Company and the Railway Company exculpated the Railway Company from damage for injuries to the employees of the Pullman Company resulting from the negligence of the Railway Company was valid.

In Ringling Bros., etc., Shows v. Olvera, 119 F.2d 584, 587, decided by this court May 2, 1941, opinion by Judge Denman, it was held that the parties to a contract could exculpate one of them from the effect of his negligence for which he would be liable under the common law. The court said:

"The United States Supreme Court, in determining the common law with regard to such agreements, before Erie Railway v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, has held that, though negligence is not mentioned in the exempting clauses, such broad provisions going to the essence of liability as 'all risk of loss or damage', 'at consignee's risk of loss and damage', 'all risk of accident to person and baggage', and 'no obligation or risk in case of accident or damage to men and supplies' relieve from liability for ordinary negligence a railroad company contracting in its private and not public service capacity. Santa Fe Ry. v. Grant Bros., 228 U.S. 177, 188–194, 33 S.Ct. 474, 478, 57 L.Ed. 787." There is a large number of cases cited in footnote No. 4 in which this rule is applied. This court accordingly held that a contract between the plaintiff who claimed to have been injured while performing on the trapeze in the Ringling circus and the proprietor of the circus whereby it was exempted from responsibility for injuries resulting from its negligence, was a valid contract.

The rule is thus stated in Restatement of the Law, Contracts, ch. 18, p. 1079, § 574: "A bargain for exemptions from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in § 575."

The applicable portion of § 575 referred to as excepted is subdivision (b) where:

"(b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation."

It follows from the foregoing authorities that a contract exempting one of the parties thereto from the results of his negligence is legal unless public policy forbid such contract.

The question under this rule of general law, then, is whether or not there is a duty of public service which affects the validity of the contract because to sustain its validity would excuse the negligent party from the performance of a part of its duty to the public for which it had received, or been promised, compensation. We think not. Here the parties were free to contract in any manner they chose. The Motor Car Company was in no sense a public utility or charged with a public duty. The shipowner was at liberty to select any vendor of engines to replace the old engine, and to employ the seller or anyone else to install it. If we follow the decision of the Fourth Circuit Court of Appeals in the case of the Newport News Shipbuilding & Dry Dock Co. v. United States, supra, in dealing with a maritime contract we will sustain the validity of such a contract provision. The decisions relied upon by that court and the Supreme Court decisions we have cited and discussed above indicate that with the exception of common carriers dealing with goods or persons being transported as such common carrier and contracts for towage, the right of private persons to contract as they please will be sustained by the federal courts.

#### Effect of bailment.

The Insurance Company relies strongly upon decisions and text books holding that a bailee for hire cannot exculpate himself from the effects of his own negligence in relation to the goods bailed, by a contract to that effect.

This court, in Lake Union Dry Dock & Machine Works v. United States, 79 F.2d 802, 803, held that a shipyard repairing a vessel was a bailee liable for negligence in case of the loss of the vessel by fire but this decision, and others holding such a contract to be a bailee for hire, does not require the court to apply the rules of general law applicable thereto in the case of a maritime contract.

In 27 R.C.L. 997, § 57, and in 8 Corp. Jur. Sec., Bailments, § 26, and 6 Cor.Jur. 1112, § 44, 4 Cal.Jur. 17, § 11, it is said that a bailee for hire can contract against liability except for his own negligence. See also, 25 Cal.Jur. 959, § 16, citing Cal.Civ. Code, § 1858e, as to damage by fire. To some extent the cases cited to the texts above are based upon the public character of a warehouseman and upon the offer to the public of a contract containing such limitation. It is held that to permit the bailee to contract against his own negligence is in conflict with public policy.

The law of California, as stated in Dieterle v. Bekin, 143 Cal. 683, 77 P. 664, supra, and Wilson v. Crown Transfer & Storage Co., 201 Cal. 701, 258 P. 596, precludes a warehouseman from contracting against the effects of its own negligence with reference to the goods stored.

The appellee contends that the rule generally applicable to bailees for hire is applicable to the contract of the Motor Car Company because of its relation to the public, that is, because it holds itself out as doing a repair business. As we have said, we can see nothing in the relations between the parties which would prevent them from negotiating a contract at arm's length and, consequently, nothing which would prevent them from exculpating the Motor Car Company from damages for injuries to the vessel resulting from its negligence while in possession.

The practical effect of the agreement between the parties was to give the Motor Car Company the benefit of the fire insurance coverage of the owner of the gasoline launch during the short period necessary for the removal of one engine and the installation of another. It is true that the contract does not mention insurance but if, as seems likely, the parties had such insurance in mind, it is certainly an anomaly to permit the insurance company to recover from the Motor Car Company on the ground that the insured had no right to make such a contract. However, we do not base our decision upon the fact that there was fire insurance in the case at bar.

## Rescission.

■ The next question involved is whether or not the contract between the Motor Car Company and the owners of the gasoline launch so far as the question of responsibility for damages is concerned, is still in effect. The Insurance Company claims, and the trial court held, that the contract between the parties on March 12, 1940, rescinding the contract of January 4, 1940, voided such contract ab initio and that the rights of the parties should be determined without regard to that contract. It is true that the contract of March 12, 1940, expressly stipulated that the conditional sales agreement of January 4, 1940, of the first motor which was to be installed in the Pacifica was rescinded by agreement. We think the intent of the parties as disclosed by the instrument and by the circumstances under which it was executed was that the contract for the purchase and sale of the motor which was to be installed in the Pacifica was no longer to be enforced or binding upon the parties. It is inconceivable that it was intended by this contract to purchase a motor for $1,400, that the Motor Car Company intended to agree that if its workman was negligent in starting the fire which destroyed the Pacifica it should be liable to pay $3,200 to the Insurance Company by reason of the destruction of the Pacifica. We think that in using the word "rescind" the parties had in mind a prospective and not a retrospective operation, a termination and not a restoration of the status of January 4, 1940, when the contract was entered into. This view is strengthened by consideration of another contract dated on the same day, May 12, 1940, offered in evidence but rejected. The appellant claims that the rejection was error. This contract provided that R. Jack Hofmann "releases the Hall-Scott Motor Car Company from all liability and claims of any kind or nature whatsoever; for any loss or damage which the undersigned may have incurred arising out of the damage to the cruiser Pacifica (referred to in the agreement of conditional sale dated January 4, 1940) whether said claim be for injury to the boat or for loss of its use or otherwise-soever.

"I have been paid the sum of $3,200 by the Universal Insurance Company, under its marine insurance policy of the cruiser 'Pacifica' by reason of its destruction by fire on January 5th, 1940, and the within release does not purport to be, nor is it a waiver of any claim that the Universal Insurance Company might have by reason of the said payment."

If it were otherwise in doubt it would be clear from this statement that there was no intention on the part of either of the parties to affect the right of the Universal Insurance Company which, under the terms

of the insurance policy, had already been subrogated to the right of the owner to claim damages because of the alleged negligence of the Motor Car Company or to restore the status quo of January 4, 1940. It is clear from this statement that neither party has any thought of giving a right of action to the Insurance Company which it did not already possess. It was error to exclude this supplemental contract of March 12, 1940, but we think that there remained enough evidence before the court to show that the parties intended to terminate the contract and not to restore the parties to the situation at the time the contract was entered into.

The statement of the Supreme Court of Errors of Connecticut in George H. Finlay & Co. v. Swirsky, 98 Conn. 666, 120 A. 561, 563, is apt on this point. Two of the parties had given notice that they rescinded the contract with another party. The court said:

"It seems to be the reasonable deduction from the decisions of the courts which have considered most logically and thoroughly the subject of the rescission of contracts that the party not in default may, if he choose, accept the renunciation of the other party and annul the contract so that it shall be as if it had never been made, or, if he prefer, may terminate and abandon the further performance of the contract, without retroactive effect, and leaving each party under the liabilities or with the rights and remedies which have arisen from the conditions existing at the time when the contract was thus cut off. Which choice has been selected in any case must be determined by fair interpretation of the language used to indicate intention, and in the light of the conditions and circumstances present at the time the intention was distinctly and finally made known. In Hayes v. City of Nashville [6 Cir.], 80 F. 641, 26 C.C.A. 59, the court states the rule of construction thus:

' " 'Courts consider not only the language of the party, but all the circumstances, including the effect of a complete rescission upon the rights of the parties, and the probability or improbability that the complaining party intended such a result, in reaching a conclusion as to the proper construction of the language used.'

"In Hurst v. Trow Co., 2 Misc. 361, 22 N.Y.S. 371, the court said:

" 'Obviously a single word like the word "rescind," cannot be wrenched from its context, and construed alone, in its unqualified, strict, and technical sense, in disregard of the surrounding circumstances.' "

As stated by the Circuit Court of Appeals for the Sixth Circuit in the case above cited by the Connecticut court (Hayes v. City of Nashville, 80 F. 641, 646):

"It very frequently happens that laymen do not distinguish between these two ways of ending a contract, and, therefore, that words are used by a party which, literally and strictly construed, would effect a complete rescission and destruction of the contract, when the party's real intention is only to declare his release from further obligation to comply with the terms of the contract by the default of the other party, and his intention to hold the other for damages."

Furthermore, as already stated, in the pleadings herein both parties count upon a contract for the repair of the vessel. The verbal agreements, if any, at the time of the delivery of the vessel in December, 1939, merged into the contract of January 4, 1940, and the rescission of that contract ab initio would leave the parties without contractual relationship or with a verbal contract almost identical with the written contract rescinded—a contract which had been rendered impossible of fulfillment by the total destruction of the Pacifica. Clearly there was no such intent.

We hold that the rights of the parties with reference to the loss by fire were not affected by the agreement to rescind. It follows that the judgment must be reversed and judgment ordered for the defendant upon the admitted facts.